UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RUBY BELTON, M.D.,

                                    Plaintiff,

                                                                                DECISION AND ORDER

                                                                                18-CV-6776L

                        v.

BORG & IDE IMAGING, P.C., et al.,

                                    Defendants.
_____


## INTRODUCTION

Plaintiff Ruby Belton, MD ("Belton"), brings this lawsuit against defendants Borg & Ide Imaging, P.C. ("B&I"), and Radnet, Inc. ("Radnet") (together, "defendants"), alleging claims for race-based and sex-based employment discrimination and for retaliation pursuant to 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, *et seq.*, as well as for breach of contract under New York state law relating to a settlement agreement between Belton and B&I fourteen years ago in 2006. (Dkt. # 1).[1]

Pending is defendants' motion to dismiss for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367 and Rule 12(b)(1) of the Federal Rules of Civil Procedure and for failure to state

_____

[1] Belton also pled federal and state age discrimination claims (Dkt. # 1 at ¶¶ 44-46), which she now concedes were "pled in error" and "should be dismissed." (Dkt. # 16 at 15). Belton's age discrimination claims are accordingly dismissed.

a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. # 13).  For the following reasons, defendants' motion is granted.

## BACKGROUND[2]

Dr. Ruby Belton, a 73-year-old resident of Pittsford, New York, is a radiologist and the only African American shareholder at B&I, where she specializes in "diagnostic radiology."  (Dkt. # 1 at ¶ 1).  She joined B&I's predecessor corporation, The Ide Group, P.C. ("Ide"), in 2004 as a physician-shareholder and employee.  (*Id.* at ¶ 9).

Part of Belton's shareholder responsibilities with Ide originally included "providing coverage" at Park Ridge Hospital ("PRH") (now known as Unity Hospital), which is located within the greater Rochester, New York, area.  (*Id.* at ¶ 9).  In 2005 and 2006, Belton alleges that she was subjected to "racially discriminatory treatment" at PRH, causing her to file an internal complaint and charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") against PRH, Ide, and Radiologix, Inc. ("Radiologix").  (*Id.*).  Radiologix is the parent of Ide and the predecessor of defendant Radnet.  (*Id.*).

Because of these claims, Belton and Ide agreed to a "Settlement Agreement, Releases, and Covenant Not to Sue" in October 2006.  (*Id.* at ¶¶ 10, 12; *see also* Dkt. # 13-3 (the "2006 Settlement Agreement"[3])).  The 2006 Settlement Agreement provided, among other things, that

---

[2]  The following facts are taken from Belton's complaint and assumed to be true for purposes of the pending motion. Moreover, the facts discussed herein, such as Belton's stated age and the status and conditions of her employment, represent what they were at the time she filed this complaint in October 2018.

[3]  Belton does not attach the 2006 Settlement Agreement to her complaint, but defendants have attached it to their motion to dismiss.  (*See* Dkt. # 13-3).  Belton explicitly quotes from the 2006 Settlement Agreement in her complaint (*see* Dkt. # 1 at ¶ 11), it is referenced many times throughout the complaint, and her breach of contract claim is based upon it.  Therefore, the Court will consider the 2006 Settlement Agreement to the extent necessary in resolving the pending motion because the document is "incorporated [in the complaint] by reference."  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014).

Ide would no longer schedule Belton to provide services at PRH.  (Dkt. # 1 at ¶ 10; *see also* 2006 Settlement Agreement at ¶ 11).  Because Belton's duties at PRH required her to occasionally be "on call" and/or to provide "teleradiology coverage," she agreed to "give back" a certain number of days each year to account for the fact that she would not be stationed at PRH, a number which was to be determined based on a "formula" set forth in the agreement.  (Dkt. # 1 at ¶ 11; *see also* 2006 Settlement Agreement at ¶ 5).  The 2006 Settlement Agreement also called for Ide to "adopt written procedures for reporting and responding to any complaints of harassment/unlawful discrimination."  (Dkt. # 1 at ¶ 12; *see also* 2006 Settlement Agreement at ¶ 3).  Belton alleges that Ide never implemented these procedures.  (Dkt. # 1 at ¶ 12).

In "early 2017" – over ten years after Ide and Belton entered into the 2006 Settlement Agreement – Belton "began to question" how many days B&I was requiring her to "give back," as she had noticed that from 2016-2018, the number of days had increased.  (*Id.* at ¶ 13).  This "give back" calculation reduced Belton's compensation to a degree.

In response to Belton's questions, B&I provided information and explanations to clarify the increased number of "give-back" days, which neither satisfied Belton's concerns nor "match[ed] her understanding" of the 2006 Settlement Agreement.  (*Id.* at ¶¶ 14, 15).  Follow-up efforts by Belton to reconcile B&I's information with hers were unavailing.  Dr. Frederick Cohn ("Cohn"), who is the CEO of B&I, however, "welcome[d] [Belton] to hire her own advisors to evaluate the data," as other shareholders had done in the past without incident.  (*Id.* at ¶ 17).  Belton then retained an attorney and an accountant to assist her in the matter.  (*Id.* at ¶ 18).

Belton claims that B&I, and particularly Cohn, began to treat Belton with "hostility and retaliation."  (*Id.* at ¶ 19).  Specifically, during 2017 Cohn: (1) "repeated[ly]" emailed Belton "urging her to discontinue her data review and explain herself"; (2) "accused [Belton] of trying to

shirk her responsibility in the practice"; (3) "threatened to call [Belton] in front of all the partners to discuss her shareholder responsibilities"; (4) suggested that Belton's job was "too onerous" for her; and (5) suggested to other shareholders, "without basis," that Belton may want to retire soon. (*Id.*).

In addition, (at some unspecified time) Cohn declined to appoint Belton to certain committees at B&I and leadership roles at the practice. (*Id.* at ¶ 20). Specifically, Belton volunteered for the Work-flow Committee, but Cohn "de-railed this effort and instead appointed a young Caucasian male to the role." (*Id.*). Cohn also "actively discouraged" Belton from serving on the Executive Committee, which she had volunteered to do "in the past." (*Id.*). Furthermore, "[m]ore recently" (but again, at an unspecified time), "a young Caucasian female radiologist was selected to lead the 'roll out' of a new mammography system." (*Id.*). Belton was not consulted, despite her "30 years of experience and leadership in this practice area." (*Id.*).

Moreover, Belton alleges that in February 2017, she was "harassed" by a Caucasian male shareholder at B&I, during which the alleged harasser "shouted at [Belton] and behaved in a threatening way verbally and physically while in the office," causing Belton to feel "concerned for her personal safety." (*Id.* at ¶ 21). Belton reported this incident to Cohn as "workplace harassment," and reminded him that "to [Belton's] knowledge," B&I had never implemented the reporting procedures for workplace harassment and discrimination pursuant to the 2006 Settlement Agreement. (*Id.*). B&I's counsel investigated the alleged incident and interviewed Belton. (*Id.* at ¶ 22). B&I then proposed to remedy the situation by "re-locat[ing] Belton to a different office," one at which mammography services were not performed, while "leaving the alleged harasser in place." (*Id.*). Belton rejected the proposal and claims that B&I has never reprimanded the alleged harasser. (*Id.*).

Belton eventually "became convinced" that B&I was retaliating against her for: (1) investigating B&I's compliance with the 2006 Settlement Agreement; (2) reporting workplace harassment in February 2017; and (3) filing the charge of discrimination in 2005. (*Id.* at ¶ 23). In Belton's view, Cohn's "tone and attitude towards her concerns was dismissive and belittling." (*Id.*). Furthermore, Belton's own investigation of her compensation concerns revealed that B&I was not in compliance with the 2006 Settlement Agreement and that B&I had "unilaterally changed the computation of 'give-back' days without her consent," costing her thousands of dollars in compensation. (*Id.* at ¶ 24).

Belton thus filed a charge of race and sex discrimination and retaliation with the EEOC against B&I in September 2017, which she amended on April 28, 2018 to include Radnet (the "September 2017 EEOC Charge"). (*Id.* at ¶ 27).

Since filing the charge, Belton complains that B&I and its counsel have exhibited an "overall attitude" that is "discriminatory and retaliatory," and have been uncooperative in providing information she believes is relevant to her investigation of compensation concerns. (*Id.* at ¶¶ 28, 31, 32). According to Belton, "[o]ther shareholders (upon information and belief, non-female and non-African American) have sought outside review of the same type of data and have not been treated in this manner." (*Id.* at ¶ 30). B&I's "intimidation" towards Belton, in her view, is "retaliation for taking her complaint to the EEOC." (*Id.* at ¶ 28).

## DISCUSSION

### I.    Legal Standard on a Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In deciding a motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  *See Trs. of Upstate New York Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S.Ct. 2279 (2017).  A court may also "consider any written instrument attached to the [c]omplaint as an exhibit or any statements or documents incorporated in it by reference." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (alterations and quotations omitted).

## II.    <u>Title VII</u>[4]

Title VII contains both anti-discrimination and anti-retaliation provisions.  The statute makes it unlawful for an employer to "discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  It also precludes an employer from "discriminat[ing] against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  *Id.* § 2000e-3(a).

---

[4] Discrimination and retaliation claims pursuant to the NYSHRL are analyzed under the same standards as Title VII claims.  *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) ("New York courts examine claims under [the NYSHRL] with the same analytical lens as corresponding Title VII-based claims.").  Therefore, the Court will analyze Belton's discrimination and retaliation claims pursuant to Title VII and the NYSHRL "in tandem." *See Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 n.7 (2d Cir. 2014).

Here, defendants assert several arguments in support of their motion to dismiss Belton's Title VII (and NYSHRL) discrimination and retaliation claims. (*See generally* Dkt. # 13-5 at 15-25).[5] For the reasons stated below, I agree that Belton has failed to plausibly allege that defendants either discriminated against her because of a protected characteristic or retaliated against her because she opposed an unlawful employment practice.

### A.    <u>Race- and Sex-based Discrimination Claims</u>

To state a Title VII or NYSHRL discrimination claim, "a plaintiff must show that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 247 (E.D.N.Y. 2015) (citation omitted). At the pleading stage, a plaintiff "need not [plead] specific facts establishing a prima facie case of discrimination." *Allessi v. New York State Dept' of Corr. & Cmty. Supervision*, 16 F. Supp. 3d 221, 226 (W.D.N.Y. 2014). Yet to survive a motion to dismiss, a plaintiff must still *plausibly* allege that "(1) the employer took adverse action against h[er], and (2) h[er] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).[6]

---

[5] The first of these arguments is that Belton failed to properly exhaust her administrative remedies. (*See* Dkt. # 13-5 at 15-17). I need not decide this issue, however, because I find that Belton's Title VII claims suffer from other pleading deficiencies, as explained in detail below. *See, e.g.*, *Arroyo v. Hartford Bd. of Educ.*, 2019 WL 6350629, *15 (D. Conn. 2019) ("Because [the court] find[s] that [defendant] is entitled [to dismissal] on both [plaintiff's] discrimination claims and her retaliation claim, and exhaustion of administrative remedies 'is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement,' [the court] need not reach [defendant's] arguments that [plaintiff] failed to exhaust her administrative remedies.") (citation omitted).

[6] Defendants maintain that Belton has not plausibly alleged that Radnet is her "employer." (*See* Dkt. # 13-5 at 17-18). In the complaint, Belton alleges that Radnet is a "Delaware corporation" and that "by virtue of various contractual arrangements and common control of the [B&I] workplace, has been an 'employer' of Belton as that term is defined by the statutes at issue herein." (Dkt. # 1 at ¶ 3). I do not decide whether this suffices to allege the requisite employment relationship for a Title VII claim; even assuming it does, Belton's Title VII claims still fail.

Even under this lenient pleading standard, Belton's race and sex discrimination claims fail to state a claim for relief because she has not plausibly alleged that she suffered an adverse employment action that was motivated by discriminatory animus.

### 1.   Adverse Employment Action

Initially, it is clear that much of the conduct allegedly taken by defendants against Belton fails to qualify as "adverse action" as that term is defined in the Title VII discrimination context.[7] An "adverse employment action" in this context is a "materially adverse change in the terms and conditions of employment," change that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Vega*, 801 F.3d at 85 (citations omitted).  This includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006), *cert. denied*, 549 U.S. 1282 (2007).  Generally, without more, an employer's criticisms or negative evaluations of an employee's performance do not constitute actionable "adverse employment action," *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 226-27 (E.D.N.Y. 2016) (collecting cases), nor do "everyday workplace grievances, disappointments, and setbacks," *Cunningham v. New York State Dep't of Labor*, 326 Fed. Appx. 617, 619 (2d Cir. 2009) (summary order).

Here, Belton alleges several instances of "adverse action" on the part of defendants, including that: (1) B&I was "routinely over-charg[ing]" her for "give-back" time, which "cost[] her thousands of dollars [in compensation] over a period of years"; (2) during the summer of 2017,

---

[7]  Belton only identifies defendants' "adverse actions" in the context of her retaliation claims, not her discrimination claims.  (*See* Dkt. # 16 at 9-11, 13-14).  In any event, the Court will assume that she relies upon the same set of "adverse actions" identified for her retaliation claims to also support her discrimination claims.

Cohn "harassed and ridiculed" her and said her "give-back" compensation concerns were "baseless and irrelevant," refused to further cooperate in her investigation of those concerns, threatened to make her "explain herself" in front of B&I's partnership, and suggested that her job was too hard for her; (3) at some point, Cohn deterred Belton's efforts to serve on committees and excluded her from leadership opportunities at B&I; (4) B&I did not sufficiently remedy Belton's report of workplace harassment in February 2017; and (5) following Belton's September 2017 EEOC Charge, B&I "stonewalled" her efforts to retrieve data relating to her "give-back" compensation concerns, and has "intimidate[d]" and "bull[ied]" her so she "drop[s] [her] investigation."  (Dkt. # 16 at 9-11).

Accepting these allegations as true, the majority of this conduct does not amount to "adverse action" because Belton has failed to plausibly allege (let alone offer any legal authority or analysis in her motion papers) that it resulted in "material[] adverse change[s] in the terms and conditions" of her employment.  *See Vega*, 801 F.3d at 85.

For example, Belton neither alleges nor explains how Cohn's reaction to her compensation concerns in the summer of 2017 changed the terms and conditions of her employment.  She merely alleges that Cohn sent her emails, criticized her, threatened to (but did not actually) call her in front of the partnership, and apparently started rumors about her retirement.  Without more, none of this plausibly suggests Belton experienced any resulting material changes in her employment.

The same is true of the way B&I handled Belton's February 2017 workplace harassment grievance.  Belton essentially alleges that she was unsatisfied with B&I's proposed remedy to the situation, but alleges nothing about how B&I's response negatively affected her job benefits, duties, or responsibilities.  *See, e.g.*, *Wright v. Monroe Cmty. Hosp.*, 493 Fed. Appx. 233, 237 (2d Cir. 2012) (summary order) (finding that supervisor's failure to take "any kind of disciplinary

action against [plaintiff's] co-worker" in response to co-worker's screaming at plaintiff did not constitute "adverse employment action" in the discrimination context).

Similarly, Belton has not alleged sufficient facts from which the Court can plausibly infer that her exclusion from certain committees at B&I, and B&I's decision not to select her for the roll-out of new technology, had a material impact on the terms and conditions of her employment. Though perhaps disappointing, Belton has not alleged, for example, that B&I's conduct resulted in "a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Joseph*, 465 F.3d at 90.

Moreover, B&I's decision not to fully cooperate in Belton's investigation of her "give-back" compensation concerns does not constitute an "adverse action." While B&I's conduct might have frustrated Belton's efforts and hamstrung the parties from reaching an amicable resolution of the underlying dispute, Belton has not alleged that defendants' conduct materially altered the terms and conditions of her employment. In fact, Belton alleges that she and B&I reached an agreement for her to continue working "*as scheduled* while the disputed [compensation] issues were resolved," and that "[t]his agreement continues." (Dkt. # 1 at ¶ 18) (emphasis supplied). Therefore, it appears that Belton's employment terms and conditions have remained exactly the same despite B&I's conduct.

Accordingly, because none of this conduct qualifies as "adverse action" in the discrimination context, Belton's Title VII and NYSHRL discrimination claims cannot be predicated on such conduct.

On the other hand, Belton has at least plausibly alleged that she suffered an adverse employment action regarding her "give-back" compensation concerns. Between 2016-2018, Belton alleges that defendants over-charged her for "give-back" days, allegedly costing her

thousands of dollars in compensation.  (*See* Dkt. # 1 at ¶ 24; Dkt. # 16 at 9).  Accordingly, this conduct has resulted in a "material loss of benefits."  *See Joseph*, 465 F.3d at 90.

However, Belton must still allege that her race and/or sex was a "motivating factor" in defendants' actions.  As explained below, Belton has failed to do so.

### 2.   Inference of Discrimination

Regarding causation, at the pleading stage, a plaintiff must allege facts "supporting a facially plausible inference that the [d]efendants' actions were motivated by [discriminatory] animus." *Jones v. City of New York*, 2015 WL 502227, *4 (E.D.N.Y. 2015) (quotations omitted). Indeed, it is well-settled that "mistreatment at work . . . is actionable under Title VII only when it occurs *because of* an employee's sex, or other protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis supplied).  Thus, the mere fact there was an issue relating to implementation of the 2006 Settlement Agreement does not, without more, constitute discriminating conduct.

Belton attempts to raise this inference of discrimination based on allegations of disparate treatment.  (*See* Dkt. # 16 at 13-14 (highlighting allegations of "differential treatment")).  Where, as here, "there is no direct evidence of an employer's discriminatory intent, plaintiff then has to show that the employer treated [her] less favorably than a similarly situated employee outside h[er] protected group but who is similar in all material respects to the individual whom [s]he seeks compare [her]self with." *Soloviev*, 104 F. Supp. 3d at 248 (alterations and citation omitted); *see also Jaeger*, 191 F. Supp. 3d at 230 ("[a] showing of disparate treatment – that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside h[er] protected group – is a recognized method of raising an inference of discrimination for purposes of

making out a *prima facie* case") (citations and quotations omitted).  Belton has failed to even allege disparate treatment.

It is clear that "naked assertions of discrimination without any specific factual allegation of a causal link between the defendants' conduct and the plaintiff's protected characteristic are too conclusory to withstand a motion to dismiss." *Soloviev*, 104 F. Supp. 3d at 249.  Accordingly, "a claim is properly dismissed where the plaintiff fails to plead any facts that would create an inference that any adverse action taken by any defendant was based upon a protected characteristic of the plaintiff." *Id.* (alteration and citation omitted).

In an attempt to raise the requisite "causal link" between the increase in number of "give-back" days between 2016-2018 (the only actionable adverse employment action (*see supra*, § II.A.1)), and a protected characteristic, Belton alleges that defendants subjected her to differential treatment in the following instances: (1) defendants chose a "young Caucasian female radiologist" to lead the roll-out of a new mammography system, despite Belton's experience and leadership in this field; (2) Cohn "de-railed" Belton's efforts to join the Work-flow Committee, and "instead appointed a young Caucasian male to the role"; (3) Cohn "actively discouraged" Belton from serving on the Executive Committee; (4) Belton was subjected to verbal harassment and intimidation by a Caucasian male co-worker in February 2017, and the alleged harasser was not reprimanded; and (5) in 2016, B&I promoted a Caucasian radiologist to shareholder despite having less experience with the practice than an African American physician.  (*See* Dkt. # 1 at ¶¶ 20-22, 26; Dkt. # 16 at 13-14).  Such matters, though, do not constitute disparate treatment.

Belton has not plausibly raised an inference of discrimination based on this conduct. Critically, while pointing to the above-instances in which she was allegedly treated differently than co-workers outside of her protected group, she has completely failed to allege that she was situated

"*similar[ly] in all material respects* to the individual[s] whom [s]he seeks [to] compare [her]self with." *Soloviev*, 104 F. Supp. 3d at 248 (emphasis supplied).  Her situation was unique, it was not similar to others.

Rather, Belton has alleged nothing more than instances in which she felt "mistreated and argue that it must have been because of" her race and/or sex.  *Id.* at 249 (citation omitted).  That is not enough to plausibly plead a discrimination claim; Belton's "mere subjective belief that she was discriminated against because of her [race and/or sex] does not sustain a [race or sex] discrimination claim."  *Henry v. New York City Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 410 (S.D.N.Y. 2014) (citation omitted).

Therefore, Belton's discrimination claims fail because she has not plausibly alleged that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination.  Her Title VII and NYSHRL discrimination claims are accordingly dismissed.

**B.**     **Retaliation Claims**

To state a Title VII (or NYSHRL) unlawful retaliation claim, a plaintiff must plausibly allege "that she engaged in protected [activity] under Title VII, that the employer was aware of this activity, that the employer took adverse action against [her], and that a causal connection exists between the protected activity and the adverse action."  *McCullough v. John T. Mather Hosp. of Port Jefferson, New York, Inc.*, 2019 WL 1755436, *8 (E.D.N.Y. 2019) (quotations omitted); *accord Vega*, 801 F.3d at 90 (plaintiff must allege that "(1) defendants discriminated – or took an adverse employment action – against h[er], (2) 'because' [s]he has opposed any unlawful employment practice").  Belton's retaliation claims fail for the following reasons.

### 1.   Protected Activity

Initially, Belton contends that she engaged in "protected activity" on four separate occasions: (1) in 2005, by filing race discrimination charges against PRH, Ide, and Radiologix; (2) in February 2017, by reporting workplace harassment; (3) from January through August 2017, by investigating her compensation concerns; and (4) when she filed the September 2017 EEOC Charge.  (*See* Dkt. # 16 at 8).[8]

Of these actions, only Belton's September 2017 EEOC Charge constitutes "protected activity" for purposes of her pending retaliation claims.  *See Jaeger*, 191 F. Supp. 3d at 232 (the filing of formal charges of discrimination constitutes "protected activity") (collecting cases).[9]

To be sure, "informal protests of discriminatory employment practices, including making complaints to management" can constitute "protected activity."  *McCullough*, 2019 WL 1755436 at *8.  But such complaints must be "sufficiently specific so that the employer is put on notice that the plaintiff believes [s]he is being discriminated against on the basis of [a protected characteristic]."  *Jaeger*, 191 F. Supp. 3d at 232 (alterations and citations omitted).  *See also Brummell v. Webster Cent. Sch. Dist.*, 2009 WL 232789, *5 (W.D.N.Y. 2009) ("Absent a claim of unlawful discrimination, general complaints about employment concerns do not constitute protected activity under Title VII.").  In other words, "[g]eneralized" workplace complaints do not suffice.  *See McCullough*, 2019 WL 1755436 at *8.

Belton's allegations make clear that her February 2017 report of workplace harassment and her general inquiries from January through August 2017 regarding compensation concerns were

---

[8]  Aside from summarily listing these actions, Belton provides no legal authority or analysis explaining why these actions constitute "protected activity" for purposes of a Title VII retaliation claim.  (*See* Dkt. # 16 at 8).

[9]  The Court will not consider Belton's 2005 EEOC charge for purposes of her pending retaliation claims.  Indeed, Belton herself concedes that she "does not seek damages for [her 2005 EEOC charge], having released these claims in 2006," and instead offers it as "relevant background."  (Dkt. # 16 at 8).

14

not "sufficiently specific" to put defendants on notice of any conduct prohibited by Title VII, such as her belief that she was being discriminated against because of her race and/or sex.

Regarding the workplace harassment in February 2017, beyond alleging that the alleged harasser was a Caucasian male, Belton does not allege that when she reported the incident to Cohn, she made her belief known that the incident occurred because of one of her protected characteristics.  (*See* Dkt. # 1 at ¶ 21).  So too regarding her reported compensation concerns throughout the first eight months of 2017; while Belton alleges that she raised these concerns with Cohn, she never alleges that she otherwise put defendants on notice of her view that the increase in her "give-back" days was the result of unlawful discrimination.  There was a dispute about the contract terms, but Belton never suggested that her race was the cause of the dispute.

In other words, aside from Belton's September 2017 EEOC Charge, she has not alleged any other conduct that qualifies as "protected activity" because none of the other alleged conduct in any way put defendants on notice of her belief that she was being discriminated against based on her race and/or sex.  *See, e.g.*, *McCullough*, 2019 WL 1755436 at *8 ("To the extent that an employee complains about perceived 'unfair' treatment relating to job responsibility, hiring practices, or corporate policy, but fails to link the treatment to unlawful discrimination or to his protected status, he fails to establish that he was engaged in protected activity.") (citation omitted).

Therefore, the Court will proceed to analyze Belton's retaliation claims only as they relate to her September 2017 EEOC Charge.

## 2.     <u>Adverse Action and Causation</u>

"Adverse employment action" in the retaliation context is broader than for discrimination claims: "[t]he proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in h[er] position from

complaining of unlawful discrimination." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (alterations and quotations omitted).   Moreover, to state a retaliation claim, a plaintiff must also plausibly plead the requisite causation between a protected activity and an adverse action, which may be done "(1) directly through evidence of retaliatory animus directed against the plaintiff by the defendant; or (2) indirectly either (a) by showing that the protected activity was followed closely by discriminatory treatment, or (b) through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *D'Andrea v. Nielsen*, 765 Fed. Appx. 602, 605 (2d Cir. 2019) (summary order) (quotations omitted).

At the same time, "[i]t is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity." *Cayemittes v. City of New York Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013), *aff'd*, 641 Fed. Appx. 60 (2d Cir. 2016) (summary order).   In other words, "[i]f an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory."   *Id.* (citation omitted).

Here, Belton has not plausibly alleged that her filing of the September 2017 EEOC Charge caused defendants to take any actionable adverse employment action against her.   Indeed, of the adverse actions Belton highlights, the only conduct that occurred after she filed her formal discrimination and retaliation charges was that defendants continued to challenge Belton's contractual claims.

But Belton and defendants were at loggerheads over compliance with the terms of the 2006 Settlement Agreement well *before* Belton filed the 2017 EEOC Charge, which seemingly resulted

from Belton's continued pursuit of information regarding her compensation concerns from January through August 2017.  (*See, e.g.*, Dkt. # 1 at ¶ 17).

Belton's own allegations make clear that defendants' uncooperative conduct towards her did not begin as a result of her September 2017 EEOC Charge.

Stated differently, the "adverse action" Belton relies upon to support her retaliation claims – defendants' failure to cooperate in her investigation and their hostility towards that investigation – was set in motion *before* she filed her September 2017 EEOC Charge.  Thus, such action on the part of defendants cannot serve as the basis for her retaliation claims.  *See, e.g.*, *Young v. Westchester Cty. Dep't of Soc. Servs.*, 57 Fed Appx. 492, 495 (2d Cir.) ("where the adverse action was already ongoing at the time of the protected activity, or is very similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation"), *cert. denied*, 539 U.S. 959 (2003).

For all these reasons, Belton has not plausibly alleged a retaliation claim under either Title VII or the NYSHRL and those claims are accordingly dismissed.


**III.   Section 1981 Race Discrimination and Retaliation Claims**

Belton also pleads her above-detailed race discrimination and retaliation claims pursuant to 42 U.S.C. § 1981.  (Dkt. # 1 at ¶¶ 35-40).  Defendants contend that these claims fail as a matter of law.  (Dkt. # 13-5 at 25-27).  I agree.

Section 1981 provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Relevant here, "Section 1981 discrimination claims are analyzed under the same substantive standard applicable to Title VII discrimination claims,"

*Henry*, 18 F. Supp. 3d at 410 (collecting cases), as are Section 1981 retaliation claims, *see Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  *See also Johnson v. City of New York*, 2019 WL 4468442, *13 (E.D.N.Y. 2019) ("Claims of employment discrimination and retaliation under §[] 1981 . . . are analyzed under the same framework that applies to Title VII claims.").

Accordingly, for the same reasons discussed above (*see supra*, §§ II.A-B), Belton's Section 1981 race discrimination and retaliation claims fail to plausibly state a claim and are dismissed. *See, e.g.*, *Johnson*, 2019 WL 4468442 at *13 (at the pleading stage, dismissing plaintiff's Section 1981 discrimination and retaliation claims "for the same reasons underlying the dismissal of [p]laintiff's Title VII claims").

## IV.    **Breach of Contract Claim**

It appears that Belton's primary claim may be for breach of contract against B&I.  (*See* Dkt. # 1 at ¶¶ 47-51; Dkt. # 16 at 14).  That appears to be a *bona fide* dispute.  But, having found that Belton has not plausibly alleged claims under Title VII or Section 1981, and having accordingly dismissed those claim (as well as Belton's NYSHRL claims governed by the same standards as the Title VII claims), I decline to exercise supplemental jurisdiction over Belton's remaining state law breach of contract claim, and that claim is dismissed.  *See* 28 U.S.C. § 1367(c)(3) (where a court "has dismissed all claims over which it had original jurisdiction," it "may decline to exercise supplemental jurisdiction" over the remaining state law claims); *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir 2013) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims")

(quotations omitted).  At this early stage of the litigation, the authority is clear that if no federal claims remain, the state claims should be dismissed in favor of prosecution in state court.

### V.        Leave to Replead

At several points throughout her opposition brief, Belton summarily requests leave to replead, without having filed a formal motion to amend her complaint.  (*See, e.g.*, Dkt. # 16 at 7, 12, 15; *see also* Dkt. # 16-5 (Proposed Amended Complaint ("PAC"))).  Significantly, Belton seeks this relief without attempting *at all* to explain how her PAC would cure any of the pleading deficiencies discussed herein and pointed out in defendants' motion papers.  The only relevant substantive changes the Court can glean from the PAC are further details regarding Radnet's "employer" status.  (Dkt. # 16-5 at 3-4).  As discussed above, however, Belton's claims are insufficient even assuming that Radnet qualifies as an "employer."  (*See supra*, footnote 6).

At this juncture, then, I therefore decline to grant Belton's informal and cursory request for leave to amend her complaint.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (affirming district court's denial of leave to amend because plaintiff did "not indicate[] how it could cure its pleading deficiencies[;] . . . [a] plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in the complaint").

19

## <u>CONCLUSION</u>

For all these reasons, defendants' motion to dismiss (Dkt. # 13) is granted.  Plaintiff's

complaint (Dkt. # 1) is therefore dismissed.

IT IS SO ORDERED.

_____

DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       January 12, 2021.

20